**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| | : | District Court |
| Domestic Bank<br>Plaintiff, | : | C.A. No. 07-355-S |
| Vs. | : | |
| Global Equity Lending, Inc.,<br>World Leadership Group LLC,<br>Hubert Humphrey,<br>Defendants. | :<br><br><br>: | JURY TRIAL DEMANDED |

**FIRST AMENDED COMPLAINT**

Now comes Plaintiff Domestic Bank ("Domestic") and alleges the following:

***Parties – Jurisdiction and Venue***

1. Plaintiff Domestic Bank is a federally chartered banking institution authorized to do business in Rhode Island with a principal place of business at 815 Reservoir Avenue, Cranston, Rhode Island 02910.

2. Defendant Global Equity Lending, Inc. ("Global"), upon information and belief, is a Georgia corporation with a principal place of business at 3955 Johns Creek Court, Suwanee, Georgia 30024.

3. Defendant World Leadership Group, Inc. is a Georgia corporation with a principal place of business at 3955 Johns Creek Court, Suwanee, Georgia 30024.

4. Defendant Hubert Humphrey is the CEO, founder and major shareholder of World Leadership Group, Inc. and a major shareholder in Global.

5. The diversity jurisdiction of this court is properly invoked pursuant to 28 U.S.C. §1332 as the parties are citizens of different states and the amount in controversy, exclusive of interest and costs, is greater than $75,000.00.

6. Global has sufficient minimum contacts with Rhode Island to properly invoke the jurisdiction and venue of this court pursuant to 18 U.S.C. §1391 and pursuant to the express agreement of the parties.

7. *Paragraph 23* of the Broker Agreement between the parties that is the subject of this litigation addresses governing law, jurisdiction and venue as follows:

> "THIS AGREEMENT AND LENDER'S GUIDELINES SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF RHODE ISLAND AND THE OBLIGATION, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE OF RHODE ISLAND, EXCEPT TO THE EXTENT PREEMPTED BY FEDERAL LAW. In the event of any litigation to the parties in this Agreement, such litigation may only be brought in the state or federal courts located in Providence, Rhode Island and for such purposes Broker hereby submits itself to the jurisdiction of such courts and agrees that service of process may be made upon it by certified mail, return receipt requested."

### *Background*

8. On or about June 8, 2005 Domestic and Global entered into a Broker Agreement under which Global agreed to submit single family residential mortgage loans to Domestic that meet Domestic's eligibility criteria for underwriting and possible funding.

9. The following provision of the Broker Agreement at Section 8(g) requires the Broker to exercise diligence in determining the accuracy of the information supplied to the lender.

> "Broker has made diligent inquiries into all facts and circumstances in making the loan, including all material

> representations and warranties of the borrower, and to Broker's knowledge, none of the statements, information, or documentation included in the loan application, underwriting and closing packages contain any false or misleading statements or omit material facts necessary to make such statements accurate and not misleading. After review of the entire loan application package and closing documents (including, without limitation, the loan application, earnest money or purchase contract, property appraisal, verification of income, deposits and credit sources, and closing affidavits or certifications and other representations by borrowers), Broker has no knowledge of nor any reason to know of any fraudulent information or documentation present in the loan application package, closing documents or in the origination process used to generate the loan application package or closing documents."

10. The Broker Agreement at Section 8(h) requires the Broker to verify the accuracy of appraisals in accordance with the following language:

> "Broker has no knowledge nor any reason to know of any circumstance or condition which might indicate that the appraisal is incomplete or inaccurate or that the value of the Property might not be at least the amount reported therein, or any circumstances or conditions with respect to the Property, the borrower or the borrower's credit that could reasonably be expected to cause private institutional investors to regard the loan as an unacceptable investment or cause the loan to become delinquent, or adversely affect the value or marketability of the loan or the Property."

11. The Broker Agreement at Section 8(i) prohibits conflicts of interest including ownership by Broker's employees in borrower's property or payments to said employees as stated in the following provision:

> "Except as otherwise disclosed to Lender in writing before the funding of any loan, neither Broker, nor any of its principals, employees or agents: (i) has received, or has any agreement to receive, any direct or indirect payment from any third party with respect to the loan application package (or the related real estate transaction), including without limitation, payments from escrow agents, appraisers, or real estate brokers, or agents of borrowers, (ii) has any direct or indirect ownership interest in any Property, or (iii)

> is a mortgagor in loan transaction. Broker will not collect any fees in advance of closing from prospective borrowers unless permissible under Applicable Law and fully disclosed to the Lender. Broker has not advanced funds or induced, selected or knowingly received funds by a party other than the borrower for the payment other than the amount required to obtain the loan."

12. Global employed Andre L. Little ("Little") and Joshua and Jennifer Gipson ("the Gipsons") as loan officers and authorized agents based in Florida.

13. Little and the Gipsons made several loans through Global which were funded by Domestic Bank.

14. On or about November 14, 2006 Global through Little and the Gipsons made loans to Maria Camacho and Roberto Camacho in the amounts of $274,664.00 for a first mortgage (identified as Domestic loan #1000652441) and $46,437.00 for a second mortgage (identified as Domestic loan #1000652442) on 23840 Sardinia Drive, Sorrento, Florida 32776.

15. These loans are in default, Domestic has demanded that Global repurchase them or compensate Domestic for its charges, but Global has failed and refused despite repeated demands.

16. On or about September 7, 2006 Global through Little and Gipsons made loans to a Eunice A. Findlay including a $250,800.00 first mortgage (identified as loan #1000647491) and a second mortgage in the amount of $47,025.00 (identified as loan #1000647492) on 1949 Tulagee Avenue, Melbourne, Florida 32940.

17. These loans are in default, Domestic has demanded that Global repurchase them or compensate Domestic for its damages, but Global has failed and refused despite repeated demands.

18. The Camacho and Findlay loans are no longer eligible for repurchase. They have been sold for a loss of more than $194,000.00.

19. On or about June 5, 2006 Global made two loans to Nadine Pittman including a first mortgage in the amount of $ 432,000.00 (identified as loan #1000637418) and a second mortgage of $81,000.00 (identified as loan number #10006373446) on 4749 Kangaroo Court, Antioch, California 94531.

20. These loans are in default, Domestic has demanded that Global repurchase them or compensate Domestic for its damages, but Global has failed and refused despite repeated demands.

21. On or about October 17, 2006 Global made two loans to Eva Pauline C. Aure including a first mortgage (identified as loan #1000648922) in the amount of $135,818.33, and a second mortgage in the amount of $20,400.00 (identified as loan #1000648923) on 5729 Truett Street, Forrest Hill, Texas 76119.

22. These loans are in default, Domestic has demanded that Global repurchase them or compensate Domestic for its damages, but Global has failed and refused despite repeated demands by Domestic.

23. The first Aure loan is no longer eligible for repurchase and has been settled for a loss of $39,555.00, and the second mortgage has been sold at a loss of $6,000.00.

24. Upon information and belief, Little and the Gipsons created an apparent Ponzi scheme involving real estate in which borrowers invested in pooled properties managed by Little and/or the Gipsons.

25. Regarding the Camacho and Findlay loans referenced above in *paragraphs 12 through 18,* Global materially omitted multiple other properties its Loan Officers had closed with these borrowers concurrently or shortly after Domestic closed the above-referenced Camacho and Findlay loans, thus constituting a deliberate omission that added material layered risk to the loans Domestic funded and the subsequent default of each.

26. Upon information and belief, Little and the Gipsons had knowledge that the sales prices of the properties borrowed upon by Camacho and Findlay were greater than the agreed upon fair market value reflected in the market value statement in the loan file indicating that the appraiser inflated the value of the subject properties.

27. Global's employees did not disclose to the appraiser or Domestic that the sale price reflected material concession and adjustments, omission and concealment of which improperly inflated the value assigned by the misinformed appraiser causing the appraisal to be inaccurate and allowing Global's employees to profit.

28. Global's employees received direct payments from the borrowers through Promised Land Properties Real Estate Holdings, LLC which was used for down payments and closing costs. None of the fees collected by Little and the Gipsons advanced under a Promised Land Properties Real Estate Holdings, LLC Agreement to Provide Financial Assistance were disclosed to Domestic as required in the Broker Agreement.

29. Little and the Gipsons are principals in the Promised Land Properties Real Estate Holdings, LLC and according to the Agreement To Provide Financial Assistance have a direct and/or indirect interest in the properties owned by the Camachos and Findlay.

30. With respect to the Pittman loans referenced above at *paragraphs 19 and 20*, Global knew or should have known that her reported income was materially misrepresented and inflated by approximately 200%.

31. With respect to the Aure loan referenced above at *paragraphs 21 through 23,* Global knowingly falsified income information and concealed the fact that the property was purchased for a third-party renter and not for use as a second home by the borrower which would have affected the underwriting and rate categories during the approval process.

32. Defendant World Leadership Group, Inc. operates a hierarchal marketing scheme of tiered compensation based on recruitment and productivity of subordinates, was Global's parent corporation and marketing arm, directed Global's CFO, had common officers, owners and offices, controlled Global's winding down, loaned Global approximately $800,000.00 since 2006 to pay selected creditors and authorized Global to pay Defendant Humphrey's personal taxes.

33. Defendant Global paid approximately Two Million Dollars in taxes to the Internal Revenue Service and the various state taxation divisions on behalf of Defendant Hubert Humphrey in or about 2006 at the direction of Mr. Humphrey and/or his agents causing Global to subsequently become insolvent, and is currently completing the transfer of remaining valuable assets, including personnel, files and loans, to another mortgage company, The Money Store.

34. The Chief Financial Officer of Global is also the Chief Financial Officer of World Leadership Group, Inc. and its affiliates, and reported at all times pertinent to this action to Hubert Humphrey or Mr. Humphrey's personal financial advisers.

## COUNT I
## BREACH OF CONTRACT
## AGAINST GLOBAL, WORLD LEADERSHIP GROUP, INC. AND HUBERT HUMPHREY

35. Domestic restates and realleges paragraphs 1 through 34 above as if fully incorporated herein.

36. Global made express warranties and representations regarding information it supplied on the above-referenced borrowers, the accuracy of appraisals, and the disclosure of conflicts of interest pursuant to *Section 8* of the Broker Agreement.

37. Global violated those warranties and representations regarding the information provided on the Camacho, Findlay, Pittman and Aure loans.

38. Global failed to disclose conflicts of interests by its employees regarding the Camacho and Findlay loans and failed to disclose additional pending loan applications by these borrowers.

39. Global used materially inaccurate appraisals for the Camacho and Findlay loans.

40. As a direct and proximate result of Global's material breaches of the Broker Agreement, Domestic has incurred losses and continues to incur losses on these loans.

41. Global is the *alter ego* of Defendants Hubert Humphrey and World Leadership Group, Inc.

WHEREFORE, Domestic Bank demands judgment against Global, World Leadership Group and Hubert Humphrey for its damages, plus interest, costs and attorney's fees and any other equitable or monetary relief deemed just by this Court.

**COUNT II**
**FRAUD**
**AGAINST GLOBAL,**
**WORLD LEADERSHIP GROUP, INC.**
**AND HUBERT HUMPHREY**

42. Domestic restates and realleges paragraphs 1 through 41 above as if fully incorporated herein.

43. Global's authorized agents knowingly misrepresented information about the Camachos, Findlay, Pittman and Aure in their loan applications to Domestic.

44. Appraisals were inflated, self-dealing was not disclosed, income was falsified, occupancy was falsified, relevant collateral transactions were concealed and rental arrangements were concealed.

45. These fraudulent acts and omissions by Global were knowing and intended to induce Domestic into making the above-described subject loans.

46. Domestic reasonably relied on the information, warranties and representations of Global in making these loans.

47. Domestic has been directly and proximately damaged by Global's fraudulent inducement.

48. Global is the *alter ego* of Defendants Hubert Humphrey and World Leadership Group, Inc.

WHEREFORE, Domestic Bank demands judgment against Global, World Leadership Group and Hubert Humphrey for its damages, plus interest, costs and attorney's fees and any other equitable or monetary relief deemed just by this Court.

**COUNT III**
**NEGLIGENCE**
**AGAINST GLOBAL**
**WORLD LEADERSHIP GROUP, INC.**
**AND HUBERT HUMPHREY**

49. Domestic restates and realleges paragraphs 1 through 48 above as if fully incorporated herein.

50. Global had a duty to Domestic to provide accurate borrower information in accordance with the warranties and representations in the Broker Agreement.

51. Global had a duty to Domestic to prepare borrower applications in accordance with industry standards, as well as the dictates of the Broker Agreement.

52. Global had a duty to train and supervise its employees regarding their duties and regarding acts and omissions committed in the scope of these duties.

53. Global failed to meet the standard of care required under the Broker Agreement and under industry standards.

54. Global negligently failed to adequately train and/or supervise Little and the Gipsons as well as its Loan Officers on the Pittman and Aure loans.

55. Global had a duty to ensure that third-party vendors such as loan processors and appraisers met mortgage industry and Domestic Bank's standards and specifications regarding the loans to the Camachos, Ms. Findlay, Ms. Aure and Ms. Pittman referenced above.

56. Global's third-party vendors failed to meet applicable industry and Domestic Bank standards and specifications for these loans.

57. As a direct and proximate result of the breaches by Global's third-party vendors of the industry and Domestic Bank's standards of care, Domestic has suffered and continues to suffer damages.

58. As a direct and proximate result of Global's breach of the standard of care and negligent training and/or supervision, Domestic has suffered and continues to suffer damages.

59. Global is the *alter ego* of Defendants Hubert Humphrey and World Leadership Group, Inc.

WHEREFORE, Domestic Bank demands judgment against Global, Hubert Humphrey and World Leadership Group, Inc. for its damages, plus interest, costs and attorney's fees and any other equitable or monetary relief deemed just by this Court.

## COUNT IV
## BREACH OF FIDUCIARY DUTY AGAINST GLOBAL, WORLD LEADERSHIP GROUP, INC. AND HUBERT HUMPHREY

60. Domestic restates and realleges paragraphs 1 through 59 above as if fully incorporated herein.

61. Defendants owe a duty to preserve the assets of Global for the further benefit of creditors and claimants including Domestic.

62. Defendant Hubert Humphrey received the benefit of a Two Million cash distribution from Global's assets which constituted to an improper preference over creditors and claimants including Domestic.

63. Defendant Hubert Humphrey received the benefit of a Two Million cash distribution from Global's assets which caused Global to subsequently become insolvent.

64. Defendants Hubert Humphrey and World Leadership Group, Inc. controlled Global's marketing, finances, winding down and transfer of assets and personnel to such a pervasive degree that Global was their *alter ego* and instrumentality.

65. Defendants breached their fiduciary duty to Plaintiff and Plaintiff suffered damages as a direct and proximate cause of said breach.

WHEREFORE, Domestic Bank demands judgment against Global, World Leadership Group, Inc. and Hubert Humphrey for its damages, plus interest, costs and attorney's fees and any other equitable or monetary relief deemed just by this Court.

**COUNT V**
**FRADULENT CONVEYANCES**
**BY GLOBAL,**
**WORLD LEADERSHIP GROUP, INC.**
**AND HUBERT HUMPHREY**

66. Domestic restates and realleges paragraphs 1 through 65 above as if fully incorporated herein.

67. In addition to paying approximately Two Million Dollars on behalf of Defendant Hubert Humphrey in or about 2006, Global paid approximately $200,000.00 on behalf of another officer or agent of World Leadership Group, Wood Montgomery.

68. Those payments caused Global to become insolvent.

69. After Global became insolvent, and with the intent to hinder creditors, Defendants Humphrey and World Leadership Group, Inc. transferred its valuable assets to The Money Store including a loan platform program involving personnel, products, marketing systems, compensation and administration systems, files and loans.

70. Global did not receive adequate or reasonable consideration for the transfers described above in paragraphs 67 and 69 which caused an already under-capitalized Global to become insolvent.

71. Between 2007 and 2008, after notice of the present suit, Global's assets of Ten Million Dollars were stripped by the Defendants.

72. At all times pertinent, Defendants Humphrey and/or World Leadership Group, Inc. controlled Global.

73. These payments and transfers constitute fraudulent conveyances of the assets of Global under the Rhode Island Uniform Fraudulent Conveyance Act, R.I. Gen. Laws §6-16-1 *et seq*.

WHEREFORE, Domestic Bank demands judgment against Global, World Leadership Group, Inc. and Hubert Humphrey for its damages, plus interest, costs and attorney's fees and any other equitable or monetary relief deemed just by this Court.

**COUNT VI**
**DECLARATORY JUDGMENT**
**PURSUANT TO FED. R. CIV. P. 57 AND**
**28 U.S.C. §2201**

74. Domestic restates and realleges paragraphs 1 through 73 above as if fully incorporated herein.

75. The pervasive control over Global by Defendants Hubert Humphrey and World Leadership Group, Inc. warrant piercing the corporate veil of Global and World Leadership Group, Inc. and imposition of liability on Defendants Hubert Humphrey and World Leadership Group, Inc. for debts and claims against Global.

WHEREFORE, Domestic demands a declaratory judgment against Global, World Leadership Group, Inc. and Hubert Humphrey pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. §2201 establishing that Hubert Humphrey and World Leadership Group, Inc. are jointly and severally liable for the liabilities of Global.

## COUNT VII
## INTERFERENCE WITH CONTRACT AGAINST GLOBAL, WORLD LEADERSHIP GROUP, INC. AND HUBERT HUMPHREY

76. Domestic restates and realleges paragraphs 1 through 75 above as if fully incorporated herein.

77. Plaintiff is pursuing remedies against Global for breach of the June 8, 2005 Broker Agreement.

78. Defendant Hubert Humphrey and World Leadership Group, Inc. have intentionally interfered with Plaintiff's contract with Global by depleting Global's assets and winding down its operations.

79. Defendants Hubert Humphrey and World Leadership Group, Inc. knew about the Broker Agreement and Plaintiff's claim when they intentionally interfered with Plaintiff's remedies arising from the contract.

80. As a direct and proximate result of the intentional interference of Defendants Hubert Humphrey and World Leadership Group, Inc. with the Broker Agreement, Domestic has suffered damages.

WHEREFORE, Domestic Bank demands judgment against Global, Hubert Humphrey and World Leadership Group, Inc. for its damages, plus interest, costs and attorney's fees and any other equitable or monetary relief deemed just by this Court.

PLAINTIFF DEMANDS TRIAL BY JURY FOR ALL ISSUES SO TRIABLE.

Respectfully submitted
Plaintiff Domestic Bank,
By its Attorney,

/s/Harris K. Weiner

Harris K. Weiner, Esq. #3779
321 South Main Street, Suite 302
Providence, Rhode Island 02903
Office: (401) 351-8200
Facsimile: (401) 351-9032

**Certification**

I hereby certify that on this 20th day of August 2008 I mailed, postage prepaid, a true copy of the within to the attorneys of record listed below.

/s/Harris K. Weiner

William R. Grimm, Esquire
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza
Providence, Rhode Island 02903

William McLean, Esquire
Merritt & Tenney
200 Galleria Parkway N.W., Suite 500
Atlanta, GA 30339-3183