UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

CREDIT NORTHEAST, INC.,[1]      :
                Plaintiff,      :
                                :
    v.                          :        CA 07-355 S
                                :
GLOBAL EQUITY LENDING, INC.,    :
WORLD LEADERSHIP GROUP, LLC,    :
and HUBERT HUMPHREY,[2]         :
                Defendants.     :


**REPORT AND RECOMMENDATION**

David L. Martin, United States Magistrate Judge

Before the Court is Plaintiff's Motion for Final Judgment (Docket ("Dkt.") #133) ("Motion for Final Judgment" or "Motion"). By the Motion, Plaintiff Credit Northeast, Inc. ("Plaintiff" or "Credit Northeast"), seeks assessment of damages against the defaulted Defendants. The Motion has been referred to me for preliminary review, findings, and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Hearings relative to the Motion were conducted on May 4, June 9, and August 26, 2011. For the reasons stated herein, I recommend that the Motion be treated as a motion

---

[1] Credit Northeast, Inc., has been substituted for Domestic Bank ("Domestic") as the Plaintiff in this action. See Text Order of 4/9/10 (granting Plaintiff's Uncontested Motion to Substitute Parties (Docket ("Dkt.") #119).

[2] Plaintiff Credit Northeast, Inc. ("Plaintiff" or "Credit Northeast"), notes that Defendant Hubert Humphrey ("Humphrey") signed his answers to interrogatories as "S. Hubert Humphrey, Jr." Plaintiff's Summation (Dkt. #142) ("Plaintiff's Mem.") at 1 n.1. Plaintiff requests that the caption of the final judgment to be entered in ths matter identify Humphrey as "Hubert Humphrey a/k/a S. Hubert Humphrey, Jr." Id. This Magistrate Judge so recommends.

for default judgment pursuant to Fed. R. Civ. P. 55(b)(2) and that it be granted. I further recommend that judgment be entered against Defendants in the amount of $451,275.99 plus prejudgment interest as explained in Section III. E. _infra_ at 20.

## I. Nature of the Action

This is an action for breach of contract, fraud, negligence, breach of fiduciary duty, fraudulent conveyances, declaratory judgment, and interference with contract. _See_ First Amended Complaint (Dkt. #24) ¶¶ 35-80. On or about June 8, 2005, Plaintiff's predecessor, Domestic Bank ("Domestic"), a federally chartered Rhode Island bank, entered into a Broker Agreement (the "Agreement") with Defendant Global Equity Lending, Inc. ("Global"), a Georgia corporation.[3] _Id._ ¶¶ 1-2, 8. Pursuant to that Agreement, Domestic made several loans which were originated by Global. _Id._ ¶¶ 13-14, 16, 19, 21. The borrowers subsequently defaulted on these loans. _Id._ ¶¶ 15, 17, 20, 22.

Domestic thereafter discovered that two loan officers employed by Global in Florida had created an apparent Ponzi scheme involving real estate in which borrowers invested in pooled properties managed by the loan officers. _Id._ ¶¶ 12, 24. The value of the

---

[3] Default having entered in this matter, the allegations of the First Amended Complaint (Dkt. #24) are taken as true. _See_ _Remexcel Managerial Consultants, Inc. v. Arelquín_, 583 F.3d 45, 52 (1st Cir. 2009); _KPS & Assocs., Inc. v. Designs by FMC, Inc._, 318 F.3d 1, 24 (1st Cir. 2003); _Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell, a P'ship v. Medfit Int'l, Inc._, 982 F.2d 686, 693 (1st Cir. 1993).

real estate securing some of the loans funded by Domestic had been inflated, id. ¶ 26, the income of some borrowers had been materially misstated and inflated, id. ¶ 30, and some borrowers had closed on multiple other properties concurrently or shortly after closing on the property purchased with funds provided by Domestic, id. ¶ 25. Global, despite having this knowledge, failed to provide it to Domestic. Id. ¶ 25. Domestic demanded that Global repurchase the loans or otherwise compensate Domestic, but Global refused. Id. ¶¶ 15, 17, 20, 22.

With respect to the other two Defendants, World Leadership Group, Inc.[4] ("WLG"), was Global's parent corporation and marketing arm. Id. ¶ 32. WLG directed Global's CFO, and the two corporations had common offices, owners, and officers. Id. Hubert Humphrey ("Humphrey") was the CEO of WLG and a major shareholder in Global. Id. ¶ 4. At all pertinent times Humphrey and/or WLG controlled Global, id. ¶ 72, and Global was the alter ego of Humphrey and WLG, id. ¶¶ 41, 48, 59, 64. Humphrey and WLG intentionally interfered with Plaintiff's contract with Global by depleting Global's assets and winding down its operations. Id. ¶ 78.

---

[4] The Court identifies this defendant as "World Leadership Group, Inc.," which is consistent with the averments of the First Amended Complaint. See First Amended Complaint ¶¶ 3, 4, 32, 34, 41, 48, 59, 64, 69, 72, 75, 78, 79, 80, prayer for relief. The caption of this Report and Recommendation refers to "World Leadership Group, LLC," to be consistent with the caption of the First Amended Complaint.

## II. Facts and Travel

On September 19, 2007, Domestic filed a complaint against Global in this Court. See Complaint (Dkt. #1); see also Dkt. Global answered the Complaint on November 9, 2007. See Answer of Global Equity Lending, Inc. to Plaintiff's Complaint (Dkt. #5); see also Dkt. After conducting its first Rule 30(b)(6) deposition, Domestic sought and received leave to file an amended complaint. See Supplemental Memorandum of Plaintiff in Support of Motion to Default Defendants (Dkt. #112) ("Plaintiff's Supp. Mem.") at 1-2; see also Dkt. The First Amended Complaint was filed on October 7, 2008, adding WLG and Humphrey as defendants, see First Amended Complaint ¶¶ 3-4. Global, WLG, and Humphrey (collectively "Defendants") answered the First Amended Complaint on November 28, 2008. See Dkt.

Discovery against Defendants proceeded tortuously. See Memorandum and Order Granting Motion for Entry of Default (Dkt. #120) at 5-9 (recounting course of discovery). On April 2, 2010, this Magistrate Judge granted Plaintiff's motions to default Defendants as a sanction for their repeated failures to comply with discovery obligations. See id. at 31, 36. Defendants appealed the entry of default to District Judge William E. Smith, but he affirmed this Magistrate Judge's order on November 4, 2010. See Opinion and Order (Dkt. #129).

Plaintiff filed the instant Motion on March 17, 2011. See

Dkt.  Defendants responded by filing an objection and request that they be allowed to conduct discovery.  <u>See</u> Objection to Motion [for] Final Judgment and Supporting Memorandum (Dkt. #134) ("Objection").  A hearing on the Motion was held initially on May 4, 2011.  After listening to the arguments of counsel, the Court indicated that it was uncertain whether Defendants were entitled to discovery and ordered counsel to file memoranda addressing the question.[5]  <u>See</u> Order Directing Parties to Submit Memoranda and Scheduling Further Hearing (Dkt. #136).  After reviewing the memoranda submitted, the Court concluded that Defendants were not entitled to conduct discovery prior to the damages hearing and denied Defendants' request.  <u>See</u> Order Denying Defendants' Request for Discovery and Re-Scheduling Damages Hearing (Dkt. #139).  The Court then re-scheduled the hearing on the instant Motion to June 9, 2011.  <u>See</u> <u>id.</u> at 2.  A damages hearing was held on June 9th at the conclusion of which the Court took the Motion under advisement.

On August 8, 2011, the Court sent Plaintiff's counsel a letter

---

[5] In the order directing counsel to file memoranda, the Court recounted the circumstances which created the uncertainty:

> [D]efault has been entered against [Defendants], <u>see</u> Dkt., the default was entered as a sanction because of Defendants' repeated failure to comply with their discovery obligations, <u>see</u> Memorandum and Order Granting Motion for Entry of Default (Dkt. #120) at 23-36, and Defendants have failed to comply with previous orders awarding attorney's fees to Plaintiff, <u>see</u> Order (Dkt. #42); Order for Defendants to Pay Attorney's Fees (Dkt. #126).

Order Directing Parties to Submit Memoranda and Scheduling Further Hearing (Dkt. #136) at 2.

posing a question regarding figures appearing in certain of the exhibits which were introduced at the June 9th hearing. See Letter from Martin, M.J., to Weiner of 8/8/11. The letter concluded by stating that the Court would determine after receiving Plaintiff's counsel's response whether a further hearing on the issue of damages was necessary. See id. Plaintiff's counsel's reply was received by the Court on August 11, 2011. See Letter from Weiner to Martin, M.J., of 8/9/11.

On August 16, 2011, the Court issued an order scheduling a further damages hearing for August 26, 2011, and directing the witness who had testified for Plaintiff at the June 9th hearing to be prepared to address four matters identified in the order. See Notice and Order Scheduling Further Hearing (Dkt. #143). The hearing was held on the scheduled date, and thereafter the Court again took the matter under advisement.

## III. Discussion

### A. Evidence Presented

At the June 9th and August 26th hearings, Plaintiff presented the testimony of H. Jeffrey Baker ("Mr. Baker"). Mr. Baker had been employed by Domestic for twenty-five years, and during the last five years he held the position of executive vice-president.[6] In that capacity he had responsibility for the mortgage origination

---

[6] Mr. Baker testified that Domestic was sold in March of 2010 to its present owner, Admiral's Bank.

and mortgage servicing departments of the bank.  Mr. Baker
testified to the following facts.

In June 2005 Domestic entered into a Broker Agreement with
Global pursuant to which Global was to send applicants to Domestic
for loans.  See Electronic Recording of 6/9/11 Hearing ("E.R.
6/9/11"); see also Hearing Exhibit ("Ex.") 1 (Broker Agreement).
Mr. Baker signed the agreement on behalf of Domestic.[7]  Id.
Domestic subsequently made loans to several mortgage applicants who
had been directed to Domestic by Global.  E.R. 6/9/11.  Domestic
then assigned the loans to its wholly owned subsidiary, Credit
Northeast, and Credit Northeast sold the loans in the secondary
market.  E.R. 6/9/11.  Mr. Baker identified copies of the
promissory notes for these loans, and the copies were made full
exhibits.[8]  E.R. 6/9/11; see also Exs. 2-10.  As summarized in
Plaintiff's Summation ("Plaintiff's Mem."), the exhibits reflect
the following loans:

> Exhibit 2: Promissory Note of October 17, 2006 from Eva
> Paulina Aure to Domestic Bank in the amount of $81,600
> for a first mortgage on property in Forest Hill, Texas.
> The note is endorsed into and out of Credit Northeast,
> Inc.
>
> Exhibit 3: Promissory Note of October 17, 2006 from Eva
> Paulina Aure to Domestic Bank in the amount of $20,400

---

[7] Hearing Exhibit ("Ex.") 1 (Broker Agreement) consists of fourteen
unnumbered pages.  The "Broker Agreement" begins on the seventh page, and
Mr. Baker's signature appears on the fourteenth page.

[8] Mr. Baker explained that, except for the Pittman loan, the
original loan documents would be in the possession of the purchasers of
the loans or their assignees.

for a second mortgage on property in Forest Hill, Texas. The note is endorsed into and out of Credit Northeast, Inc.

Exhibit 4: Promissory Note of June 5, 2006 from Nadine Pittman to Domestic Bank in the amount of $432,000 for a first mortgage on property in Antioch, California. The note is endorsed into and out of Credit Northeast, Inc.

Exhibit 5: Promissory Note of June 5, 2006 from Nadine Pittman to Domestic Bank in the amount of $81,000 for a second mortgage on property in Antioch, California. The note is endorsed into and out of Credit Northeast, Inc.

Exhibit 6: Promissory Note of November 14, 2006 from Maria Camacho and Robert Camacho to Domestic Bank in the amount of $247,664 for a first mortgage on property in Sorrento, Florida. The note is endorsed into and out of Credit Northeast, Inc.

Exhibit 7: Promissory Note of November 14, 2006 from Maria Camacho and Robert Camacho to Domestic Bank in the amount of $46,437 for a second mortgage on property in Sorrento, Florida. The note is endorsed into and out of Credit Northeast, Inc.

Exhibit 8: Promissory Note of September 7, 2006 from Eunice A. Findlay to Domestic Bank in the amount of $250,800 for a first mortgage on property in Melbourne, Florida. The note is endorsed into and out of Credit Northeast, Inc.

Exhibit 9: Promissory Note of September 7, 2006 from Eunice A. Findlay to Domestic Bank in the amount of $47,025 for a second mortgage on property in Melbourne, Florida. The note is endorsed into and out of Credit Northeast, Inc.

Exhibit 10: Promissory Note from Eunice A. Findlay to Domestic Bank in the amount of $177,000 for a mortgage on property in Kissimmee, Florida. The note is endorsed into and out of Credit Northeast, Inc.

Plaintiff's Mem. at 2-3.

Mr. Baker testified that some of the loans were sold by Credit Northeast to Bear Sterns/EMC Mortgage Corporation ("EMC"). E.R.

6/9/11. These loans were those corresponding to the first and second Camacho mortgages, all of the Findlay mortgages, and the first Aure mortgage. Id. EMC later demanded that Credit Northeast repurchase these loans because they were defective in their origination or had early payment defaults. Id. At the June 9th hearing, Mr. Baker described Ex. 12 as "effectively a demand letter" from EMC identifying the loans which it wanted repurchased.[9] Id. Instead of repurchasing the loans, Mr. Baker testified that Credit Northeast entered into a monetary settlement with EMC pursuant to which EMC released all claims that it had against Credit Northeast relating to loans corresponding to the Camacho first and second mortgages and the Findlay second mortgage. Id. Mr. Baker identified Ex. 11 as a copy of the Settlement Agreement between Credit Northeast and EMC dated June 18, 2007.[10] Id. He signed the Settlement Agreement as president of Credit Northeast. Id. Pursuant to the Settlement Agreement, Credit

---

[9] At the June 9th hearing, Mr. Baker testified that the loans which were the subject of the "demand letter" (Ex. 12) and which were subsequently addressed by the June 18, 2007, Settlement Agreement between Credit Northeast and EMC included those which corresponded to the Camacho first and second mortgages, all of the Findlay mortgages, and the Aure first mortgage. E.R. 6/9/11. However, at the August 26th hearing, Mr. Baker testified that while EMC had sent Plaintiff demand letters regarding all of these loans, the Settlement Agreement (Ex. 11) did not include the loans corresponding to the Aure first mortgage and the two Findlay first mortgages. E.R. 8/26/11. Accordingly, Plaintiff withdrew its request for damages based on these loans. Id.

[10] Mr. Baker stated that the original of the Settlement Agreement was in the possession of Admiral's Bank and that Admiral's Bank has not responded to requests for records relative to loans.

Northeast paid EMC $425,000 which represented approximately 28% of the face value of the loans.  Id.; see also Ex. 11 at 2.  Mr. Baker testified that if Credit Northeast had not entered into the Settlement Agreement (Ex. 11), Domestic would have had to wire the full balance of the note amounts to EMC and would have received in return notes and the mortgages.  Domestic would then have had to institute foreclosure proceedings and liquidate the notes.  E.R. 6/9/11.

The Aure second mortgage was sold by Domestic to Franklin Credit Management Corporation ("Franklin") pursuant to a Loan Purchase Agreement (Ex. 13) dated August 16, 2007.  E.R. 6/9/11; see also Ex. 13 at 1.[11]  Mr. Baker described Franklin as a participant in the "scratch and dent market" which is separate from the secondary mortgage market and involves mortgage loans which are sold at a discount.  E.R. 6/9/11.  He explained that the Aure second mortgage loan "went thirty days delinquent" before it could be sold in the secondary market and, therefore, was sold in the "scratch and dent market."  Id.  Mr. Baker identified Ex. 13 as a true and accurate copy of the Loan Purchase Agreement which he signed on behalf of Domestic.  Id.; see also Ex. 13 at 24. Domestic received $86,764.79 for the loans sold to Franklin.  Id.

---

[11] Ex. 13 consists of forty pages.  The first four pages comprise the cover page and the table of contents.  The Loan Purchase Agreement begins on the fifth page (which is page 1 of the Loan Purchase Agreement).  In citing to the Loan Purchase Agreement, the Court utilizes the page numbers appearing at the bottom of that document.

Mr. Baker testified that approximately $14,000.00 of this amount was allocated to the Aure second mortgage and that the $14,000.00 figure was based on the aggregate value of the notes sold versus the total sum the bank received. E.R. 6/9/11.

With respect to the Pittman first and second mortgages, Domestic accepted deeds in lieu of foreclosure for these loans. E.R. 6/9/11; see also Ex. 14[12] at 1 (Grant of Deed in Lieu of Foreclosure for First Mortgage); id. at 3 (Grant of Deed in Lieu of Foreclosure for Second Mortgage). Mr. Baker testified that Nadine Pittman conveyed her property on Kangaroo Court, Antioch, California, to Domestic on June 28, 2007, and that the consideration for this transaction was the cancellation of her obligations to Domestic in the amount of $432,000.00 pursuant to the first mortgage, see Ex. 14 at 1, and in the amount of $81,000.00 pursuant to the second mortgage, id. at 3; see also E.R. 6/9/11. Mr. Baker further testified that Domestic was eventually able to sell this property to Casey Nunley for $197,000.[13] E.R. 6/9/11; see also Ex. 14 at 5 (Corporation Grant Deed). The sale occurred on December 8, 2008, approximately eighteen months after Domestic had accepted the deeds in lieu of

---

[12] Ex. 14 consists of five documents which relate to the real estate which was the subject of the Pittman first and second mortgages.

[13] Although the Corporation Grant Deed (Ex. 14 at 5) does not state the consideration paid for the Pittman property, Mr. Baker testified that the document reflects a documentary transfer tax of $216.70 which, based on a tax rate of fifty-five cents ($.55) for each five hundred dollars ($500.00), indicates a sale price of $197,000.00. E.R. 6/9/11.

foreclosure. Credit Northeast suffered a loss of $316,000 as a
result of mortgage loans made to Pittman. E.R. 6/9/11. This
figure is based on a total indebtedness of $513,000.00 ($432,000.00
first mortgage + $81,000.00 second mortgage = $513,000.00 total
indebtedness) minus the amount realized from the sale to Nunley
($513,000.00 - $197,000.00 = $316,000.00).

**B. Defendants' Arguments**

Defendants make several arguments in opposition to the Motion,
all of which relate to alleged shortcomings in the documentary
evidence presented. First, Defendants argue that Plaintiff has not
provided documentary evidence that it actually loaned the borrowers
the amounts reflected in the promissory notes (Exs. 2-10). See
Memorandum of Summary of Argument by Defendants (Dkt. #141)
("Defendants' Mem.") at 2. Next, Defendants complain that
Plaintiff has failed to provide originals of the promissory notes
and certified copies of the mortgages securing these loans. See
id. at 2-3. Relatedly, Defendants complain that there is no
documentary evidence that "the two entities which purchased the
Notes and the Mortgages actually consummated such transactions with
... Credit Northeast ... by tendering Plaintiff the amount of the
Notes," id. at 4, or that the $425,000.00 referenced in the
Settlement Agreement was, in fact, tendered, to EMC, see id. at 5.
Similarly, Defendants contend that the Loan Purchase Agreement
(contained within Ex. 13) and Mr. Baker's testimony concerning the

12

settlement reached with Franklin are insufficient to establish the monies tendered by Credit Northeast to Franklin. Id. Defendants also complain that there is no documentary evidence establishing the proceeds realized from the foreclosure sale of the Pittman property. See id. at 6. In essence, Defendants contend that lack of documentary evidence prevents the Court from calculating any amount of damages based on the testimony at the hearing. See id. at 7.

The Court is unpersuaded by these arguments. Plaintiff's First Amended Complaint, upon which Defendants were defaulted, established all of the elements of liability, including the making and funding of the loans. See First Amended Complaint ¶¶ 13-23 (alleging that Plaintiff funded the loans to Camacho, Findlay, Pittman, and Aure); see also Remexcel Managerial Consultants, Inc. v. Arelquín, 583 F.3d 45, 52 (1st Cir. 2009)("an entry of default prevents the defendant from disputing the truth of well-pleaded facts in the complaint pertaining to liability"); KPS & Assocs., Inc. v. Designs by FMC, Inc., 318 F.3d 1, 24 (1st Cir. 2003)(holding that complaint's "allegations were deemed admitted as a result of [defendant's] default"); Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell, a P'ship v. Medfit Int'l, Inc., 982 F.2d 686, 693 (1st Cir. 1993)("[T]here is no question that, default having been entered, each of [plaintiff's] allegations of fact must be taken as true and each of its [] claims must be considered established as a

matter of law.")(alterations in original).  In addition, Mr. Baker's testimony established that the loans were made and funded by Domestic.  True and accurate copies of the notes were admitted as full exhibits at the hearing, and the unavailability of the originals was adequately explained by Mr. Baker.  Moreover, Defendants do not appear to dispute the genuineness of the copies.  See Defendants' Mem. at 3 ("Defendants are in no way impugning the credibility of the Plaintiff and its claim for damages through Baker's testimony concerning the genuineness of the copies of the Notes ...."); id. ("Defendants do not believe that there is an issue of existence of the Mortgages ....").

Despite these concessions, Defendants, nevertheless, contend that Plaintiff should be made to jump through additional procedural hoops based on the best evidence rule.  See Defendants' Mem. at 3.  As Mr. Baker's testimony alone would have been sufficient to satisfy Plaintiff's burden of proof, the Court rejects this contention.  See R&R Assocs., Inc. v. Visual Scene, Inc., 726 F.2d 36, 38 (1st Cir. 1984)(holding that best evidence rule did not prohibit president of plaintiff in breach of contract action from testifying regarding cost to plaintiff corporation of procuring allegedly defective sunglasses from defendant simply because the fact can be supported by written documentation); see also United States v. Donato-Morales, 382 F.3d 42, 45 n.2 (1st Cir. 2004) (finding no violation of best evidence rule where price of VCR was

proved by officer's testimony rather than a written printout from the scanner where "[t]he officer's testimony was not offered to prove the content of the scanner display, but rather the price of the VCR").

Like the president in R&R Associates, Inc., when Mr. Baker testified as to the amount of the loans and the losses which Plaintiff sustained as a result, he was not attempting to prove the contents of the promissory notes, mortgages, and related agreements and documents. See R&R Assocs., Inc., 726 F.2d at 38. Rather, he was attempting by his own direct testimony to prove a particular fact: the amount of the loss which Plaintiff sustained as a result of making these loans. See id. (making similar distinction); id. ("To be sure, plaintiff had in its possession written documentation that presumably supported President Smith's testimony. But, as the advisory committee note makes clear, [Fed. R. Evid.] 1002 applies not when a piece of evidence sought to be introduced has been somewhere recorded in writing but when it is that written record itself that the party seeks to prove. The rule 'requiring the production of the original document applies only when the proponent is attempting to prove the contents or terms of a writing.'") (quoting G. Lilly, An Introduction to the Law of Evidence § 116 (1978))(footnote omitted). "[N]o evidentiary rule ... prohibits a witness from testifying to a fact simply because the fact can be

supported by written documentation."[14]  Rodríguez v. Señor Frog's
de La Isla, Inc., 642 F.3d 28, 34 (1st Cir. 2011)(second alteration
in original).

Defendants make two additional arguments.  They claim that
because the promissory notes were endorsed by Credit Northeast "the
issue remains whether they were properly assigned to either EMC or
Franklin." Defendants' Mem. at 4.  Relatedly, Defendants complain
that with respect to the Settlement Agreement between Northeast and
EMC, "no documents [were] introduced into evidence confirming the
endorsement and assignment of the Notes and Mortgages ...." Id.
at 5.  However, as already explained, Mr. Baker's testimony alone
was sufficient to establish the amount of Plaintiff's damages.
Thus, it was not necessary for Plaintiff to introduce supporting
documentary evidence.  Furthermore, as Defendants are not parties
to the agreements between Credit Northeast and EMC or Franklin,
Defendants have no standing to complain about alleged deficiencies
in the assignment process.  See Brough v. Foley, 525 A.2d 919, 921
(R.I. 1987)(holding that the "sole right that plaintiffs had in
respect to the subject real estate is set forth in the sales

---

[14] To the extent that Defendants' argument rests on the contention
that copies of the documents should not have been admitted as full
exhibits at the hearing, the Court rejects this contention.  "The
determination of whether a proper foundation has been laid for the
introduction of evidence lies within the sound discretion of the district
court." United States v. McMahon, 938 F.2d 1501, 1508 (1st Cir. 1991).
Here there was no reason to doubt that the documents were true and
accurate copies of the originals, and the absence of the originals was
satisfactorily explained.

agreement that they entered into with [the executor] .... This
agreement gave no right to plaintiffs to second-guess the validity
of the right of first refusal, nor did it give plaintiffs the right
to supervise or pass upon the effectiveness of the assignment to
[the assignor]'s nominee, or the nominee's exercise of that
assignment."); id. at 922 ("The plaintiffs were, in substance,
strangers to those transactions and were given no rights under the
contract to challenge the transactions."); State v. Med.
Malpractice Joint Underwriting Ass'n, No. 03-0743, 2005 WL 1377493,
at *2 (R.I. Super. Ct. June 7, 2005)("Only parties to the contract
or intended third party beneficiaries may seek to have rights
declared under a contract.")(citing Forcier v. Cardello, 173 B.R.
973, 984-85 (Bankr. D.R.I. 1994)).

Defendants' final argument is that a sheet of paper which Mr.
Baker prepared and to which he referred during the June 9th hearing
is inadequate to establish Plaintiff's damages.[15] See Defendants'
Mem. at 6. This is another variation of Defendants' contention
that Plaintiff was required to present documentary evidence to
establish its damages. The Court has already found that Mr.
Baker's testimony by itself was sufficient to establish Plaintiff's
damages and that Plaintiff was not required to present documentary
evidence corroborating that testimony. Moreover, it was Defendants

---

[15] It bears noting that the amount of damages reflected on this piece
of paper (Ex. A) is no longer the amount of damages which Plaintiff is
seeking. See n.9.

who introduced the paper as an exhibit–not Plaintiff.  Thus, Defendants' complaint is directed at their own exhibit (Ex. A).

In sum, Defendants' arguments are unpersuasive.  Mr. Baker's testimony regarding the amount of the losses which Plaintiff suffered as a result of the loans and how those losses were determined was clear.  Although not required, Plaintiff's exhibits supported that testimony.  Defendants' contention that the evidence adduced at the hearing was insufficient to allow the Court to determine "any amount of damages," Defendants' Mem. at 7, is rejected.

### C.  Attorney's Fees

Pursuant to ¶ 18 of the underlying Broker Agreement between Domestic and Global, the successful or prevailing party is entitled to reasonable attorney's fees and other costs incurred in any action brought for the enforcement of the agreement or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of the agreement. Plaintiff's attorney, Harris K. Weiner ("Mr. Weiner") submitted an affidavit in support of the fees which Credit Northeast has paid in this action.  <u>See</u> Ex. 15 (Affidavit of Harris K. Weiner ("Weiner Aff.")).  That affidavit evidences unreimbursed attorney's fees and unpaid sanctions in the total amount of $46,927.71.  <u>Id.</u> at 2.

### D.  Calculation of Damages

Based on Mr. Baker's testimony and the exhibits introduced by

Plaintiff at the hearings, Plaintiff's damages amount to $454,876.37. This figure represents Plaintiff's losses on the loans and mortgages listed below plus its legal expenses:

| | |
|---|---|
| Camacho mortgage loans | $82,348.28[16] |
| Pittman mortgage loans | $316,000.00 |
| Aure second mortgage loan | $6,000.00[17] |
| Unpaid legal fees and sanctions | $46,927.71[18] |

---

[16] This amount of $82,348.28 is 28% of the Camacho loans [$247,664.00 (first mortgage loan) + $46,437.00 (second mortgage loan) = $294,101.00 (total loans) x 28% = $82,348.28]. See Exs. 6, 7. Mr. Baker testified at the June 6th hearing that the Camacho loans were included in the Settlement Agreement (Ex. 11) and that the $425,000.00 paid pursuant to that agreement represented approximately 28% of the face value of the loans. Accordingly, the Court has used the 28% figure in determining the loss Plaintiff sustained as a result of the Camacho loans.
The Court has declined to use the slightly higher figure of $85,948.66 to which Mr. Baker testified later at the same hearing. The $85,948.66 figure was based on an early payment default (EPD) claim of $306,959.51. See Ex. A ($306,959.51 x 28% = $85,948.66). Although the Court has considered Plaintiff's explanation of why the $306,959.51 figure shown on Ex. A exceeds the total amount of the Camacho loans, see Letter from Weiner to Martin, M.J., of 8/9/11; see also Letter from Martin, M.J., to Weiner of 8/8/11, the Court is unpersuaded that the 28% should be applied to the $306,959.51 figure. Accordingly, the Court uses the lower figure of $294,101.00.

[17] The Court notes that the amount of the loan which corresponds to the Aure second mortgage was $20,400.00, see Ex. B, and that Mr. Baker testified at the June 6th hearing that approximately $14,000.00 of the sum which Domestic received from Franklin was allocated to the Aure second mortgage, see E.R. 6/9/11. Subtracting $14,000.00 from $20,400.00 actually results in a loss of $6,400.00. However, as $6,000.00 is the amount of the loss which Mr. Baker testified Plaintiff sustained as a result of the Aure second mortgage and this figure is more favorable to Defendants, the Court uses the $6,000.00 figure.

[18] The sanctions are reflected in two orders: this Magistrate Judge's January 14, 2009, Order (Dkt. #42) reflecting a December 16, 2008, ruling that Global must pay Plaintiff an attorney's fee of $1,575.00 and District Judge Smith's November 4, 2010, Opinion and Order (Dkt. #129) upholding this Magistrate Judge's award of attorney's fees and costs in connection with the default. The latter award, which Defendants were

Total Damages:    $451,275.99

Accordingly, I find that Plaintiff's damages in this matter total
$451,275.99.

        **E.  Prejudgment Interest**

        Plaintiff requests that prejudgment interest on the loss
attributable to the Camacho first and second mortgage loans (which
loss the Court has determined to be $82,348.28) should commence
running on June 18, 2007, the date of the Settlement Agreement with
EMC.  <u>See</u> Plaintiff's Mem. at 4.  Regarding the $6,000.00 loss
attributable to the Aure second mortgage loan, Plaintiff requests
that prejudgment interest run from August 16, 2007, the date of
sale of the loan to Franklin.  <u>Id.</u>  With respect to the $316,000.00
loss attributable to the Pittman loans, Plaintiff requests that
prejudgment interest run from December 19, 2008, the date that
Domestic was able to sell the property to Nunley.[19]  <u>See id.</u>  The
Court agrees that prejudgment interest should run from these dates.
I so recommend.

**IV.  Conclusion**

        For the reasons stated above, I recommend that Plaintiff's

_____

ordered jointly and severally to pay, was for $10,300.00.  Order for
Defendants to Pay Attorney's Fees (Dkt. #126) at 3.  The Weiner Aff.
attests that neither of the sanctions has been paid and reflects that the
figure of $46,927.71 is the sum of $35,052.71 (unreimbursed attorney's
fees) + $1,575.00 (first sanction) + $10,300.00 (second sanction).

        [19] Plaintiff notes that it is not seeking accrued interest or
carrying costs for the seventeen months that it took to sell the real
estate which secured the Pittman loans.  <u>See</u> Plaintiff's Mem. at 4; <u>see
also</u> <u>id.</u> at 5.

                            20

Motion for Final Judgment be granted and that judgment be entered against Defendants in the amount of $451,275.99 plus prejudgment interest as explained in Section III. E. _supra_ at 20. I further recommend that the final judgment identify Defendant Humphrey as "Hubert Humphrey a/k/a S. Hubert Humphrey, Jr."[20]

Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within fourteen (14) days of its receipt. _See_ Fed. R. Civ. P. 72(b); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision. _See_ _United States v. Valencia-Copete_, 792 F.2d 4, 6 (1st Cir. 1986); _Park Motor Mart, Inc. v. Ford Motor Co._, 616 F.2d 603, 605 (1st Cir. 1980).


_/s/ David L. Martin_
DAVID L. MARTIN
United States Magistrate Judge
September 8, 2011

---

[20] _See_ n.2.